**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

WASHINGTON COUNTY WATER
COMPANY, INC.,

          **Plaintiff,**

v.                                                                   Case No. 3:20-CV-1052-NJR

CITY OF SPARTA,

          **Defendant.**

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This is a case about a small town's aging water treatment facility and the fight over who should provide finished, potable water to its 900 citizens. That small town is the Village of Coulterville, which is part of Randolph County in Southeast Illinois. To the southwest of Coulterville lies the City of Sparta ("Sparta"). To the north and northwest of Coulterville is Washington County, Illinois. Both Sparta and Washington County Water Company, Inc. ("WCWC"), a rural water association, claim the right to service Coulterville and have filed cross-motions for summary judgment. Sparta also has filed two motions to exclude certain opinion testimony of WCWC's expert Lindsey L. Bowlin, P.E., as well as a motion for discovery sanctions.

For the reasons set forth below, the Court denies Sparta's motions to exclude expert testimony and for discovery sanctions, but grants Sparta's motion for summary judgment. WCWC's cross-motion for summary judgment is denied.

BACKGROUND

Since 1979, WCWC, a not-for-profit corporation, has owned and operated a public water distribution system that provides water service to residents and businesses in Washington County and surrounding counties in Southern Illinois. (Doc. 21-1 at ¶ 2). Since its inception, WCWC has been continuously indebted to the United States Department of Agriculture ("USDA") for loans used to build and operate its water distribution system. (*Id.* at ¶ 4). WCWC's existing federal indebtedness is approximately $5.318 million. (*Id.*).

WCWC does not operate a water treatment plant. (*Id.* at ¶ 15). Instead, WCWC purchases finished water from several suppliers and delivers it to customers through its distribution system. (*Id.*). Specifically, WCWC purchases water from four sources: the Kaskaskia Water District, the City of Nashville, Illinois, the Rend Lake Conservancy District, and the Kinkaid-Reed's Creek Conservancy District. (Doc. 21-1 at ¶ 16). Its agreements with these sources allow it to purchase the following amounts of water:

- Kaskaskia Water District: 25 million gallons per month (819,672 to 833,333 gallons per day);

- City of Nashville: 432,000 gallons per day; and

- Rend Lake: 450,000 gallons per day.

(*Id.* at ¶ 17; Doc. 20-7). In sum, under its water supply contracts with Kaskaskia, Nashville, and Rend Lake, WCWC can purchase a maximum of 1,701,672 to 1,715,333 gallons per day. (Doc. 20-7 at pp. 23, 25). WCWC also purchases water from the Kinkaid-Reed's Creek Conservancy District pursuant to a water contract under which WCWC

provides water to certain customers within the District's boundaries. (Doc. 20-13). The Kinkaid District-WCWC system is essentially a "closed loop," and WCWC has never taken water sold to it under the Kinkaid contract and distributed it through its water distribution system. (Doc. 20-3 at pp. 37-40).

Currently, WCWC distributes more than 360 million gallons of water annually to about 4,765 customers. (Doc. 21-1 at ¶ 6). WCWC does not have defined service boundaries but instead is authorized by statute to provide water service across the state where it can make service available. (*Id.*). Between 2016 and 2020, the average daily demand for water from WCWC's customers ranged from 930,688 gallons per day to 992,648 gallons per day. (Doc. 21-14).

The Village of Coulterville, Illinois ("Coulterville"), owns and operates a water treatment and distribution system using raw water from its reservoir. (Doc. 21-1 at ¶ 9). Due to its age and condition, Coulterville's treatment plant has reached the end of its useful life. (Doc. 20-16 at ¶ 4). Thus, Coulterville is seeking a new source of safe, finished water for distribution to its customer and residents. (*Id.*). Coulterville's average water demand is approximately 89,712 gallons per day. (Doc. 21-2 at ¶ 10). Several times in the past, Coulterville has approached WCWC informally about purchasing finished water from WCWC. (Doc. 21-1 at ¶ 10). WCWC confirmed that it had service available should Coulterville request it (*id.*); however, WCWC has never guaranteed the volume of water per hour or day that it would be able to supply to Coulterville. (Doc. 20-16 at ¶ 6).

In 2019, Coulterville commissioned HMG Engineers, Inc. ("HMG") to investigate the feasibility of Coulterville obtaining a new source and supply of potable water, based

on a review of historical water demands and projected future demands, and to evaluate water supply alternatives based on water quality, quantity, and cost. (*Id.* at ¶ 5). Two of the alternatives that HMG investigated was for Coulterville to purchase finished water from WCWC or from Sparta. (*Id.*).

Upon the completion of its study, HMG recommended that Coulterville purchase finished water from Sparta due to cost and WCWC's inability to provide water service to the entire Village. (*Id.* at ¶ 9). HMG concluded that WCWC's water system would be unable to fill Coulterville's 150,000-gallon elevated water storage reservoir with the high-water level elevation of 691. (Doc. 20-15 at pp. 14-15). Further, the maximum water flow WCWC could provide is 120,000 gallons per day over a 24-hour period. (*Id.* at p. 15). Thus, in addition to a booster pump station at the point of intersection with WCWC's water system, a 150,000-gallon ground storage reservoir would be required to make the connection feasible. (*Id.*). HMG estimated the cost of these infrastructure improvements would total $1,045,534. (*Id.*).

Under WCWC's policies, it would be Coulterville's responsibility to design and construct any infrastructure it would need to establish an additional connection to WCWC, as well as to obtain the necessary permits. (Doc. 21-1 at ¶ 20). Currently, WCWC has an 8" water main located approximately 1,000 feet from the proposed point of interconnection with Coulterville, though it is not located within Coulterville's corporate limits. (Doc. 20-8 at pp. 2-3). WCWC would require Coulterville to construct its own ground storage tank and pump station to protect against any surges in demand and to construct the necessary 1,000-foot transmission line to the point of connection with

WCWC. (Doc. 21-1 at ¶ 20). Additionally, WCWC cannot guarantee that it could supply Coulterville with enough water for any potential fire suppression needs, even though one of Coulterville's largest water customers is a coal mine. (Doc. 20-16 at ¶ 10).

Based on HMG's assessment of the infrastructure improvements required for WCWC to make water service available to Coulterville, WCWC's apparent lack of excess water capacity to meet Coulterville's needs, and WCWC's inability to commit to a minimum water quantity that it would be able to provide, Coulterville declined to request water service from WCWC. (*Id.* at ¶ 11). Instead, Coulterville pursued HMG's recommendation that it purchase finished water from Sparta. (*Id.*).

When WCWC learned that Coulterville was seeking a new source of water, it sent letters through legal counsel to both Coulterville and Sparta, claiming to have a federally protected right to service Coulterville under 7 U.S.C. § 1926(b). (*Id.* at ¶ 12; Doc. 21-1 at pp. 9-11). WCWC asserted in the letters that it is a federally indebted rural water association that is protected under 7 U.S.C. § 1926(b) from municipal encroachment within areas where the association provides water service. (Doc. 21-1 at pp. 9-11). Because Sparta's attempt to provide competing water service to Coulterville constitutes a clear violation of Section 1926(b), WCWC requested that Sparta cease and desist any further attempts to provide water service to Coulterville. (*Id.*).

When those efforts failed, WCWC filed a Complaint for Declaratory Judgment and Preliminary and Permanent Injunction alleging Sparta is unlawfully encroaching and attempting to curtail WCWC's federally protected service area. (Doc. 1). In Count 1, WCWC seeks declaratory judgment under 7 U.S.C. § 1926(b) because Coulterville lies

within WCWC's federally protected service territory, Sparta's efforts to serve Coulterville will curtail and limit the supply of water by WCWC, and WCWC can handle any additional water supply needs that Coulterville may have. (*Id.*). In Count 2, WCWC alleges Sparta's actions, conducted under color of state law, have deprived it of its federal rights pursuant to 42 U.S.C. § 1983. (*Id.*). In Count 3, WCWC seeks a preliminary and permanent injunction enjoining Sparta from taking further action to supply water to Coulterville or to curtail the service made available by WCWC. (*Id.*). Finally, Count 4 asks the Court to hold in a constructive trust all water lines, mains, meters, tanks, pumps, and other facilities constructed by Sparta for the disputed territory. (*Id.*). WCWC asks that these items be conveyed to WCWC as an equitable remedy. (*Id.*).

The parties have now filed cross-motions for summary judgment. (Docs. 19, 21). WCWC argues it is entitled to protection under 7 U.S.C. § 1926(b) because it is an association under the statute, it has qualifying indebtedness to the USDA, and it has made service available to Coulterville in that Coulterville is a current customer of WCWC and it has sufficient facilities to accommodate Coulterville's water needs. (Doc. 21). Sparta argues WCWC does not have the capacity to provide water service to Coulterville under Illinois law, and the cost of obtaining water service from WCWC makes its service "unavailable" to Coulterville. (Doc. 19). Sparta also filed two motions to exclude certain opinion testimony (Docs. 18, 26) and a motion for sanctions. (Doc. 27). The Court held a hearing on the motions on July 13, 2022.

DISCUSSION

**I.      Motions to Exclude Testimony of WCWC's Expert, Lindsey L. Bowlin, P.E.**

Before addressing the cross-motions for summary judgment, the Court first addresses Sparta's two motions to exclude certain opinion testimony of WCWC's expert, Lindsey L. Bowlin, P.E. (Docs. 18, 26).

Bowlin is a professional engineer licensed in Illinois and employed by Heneghan and Associates, P.C., which has provided professional engineering services to WCWC for approximately 27 years. (Doc. 18-1). Bowlin has 11 years of experience in utility analysis, funding acquisition and document development, project planning, preliminary and final design, permit preparation, bidding, and construction administration of water and wastewater treatment facilities, municipal and rural water systems, water storage and booster pump stations, wastewater pumping stations and force main design, and wastewater collection systems. (*Id.* at p. 7).

In its first motion (Doc. 18), Sparta seeks to exclude testimony offered by Bowlin regarding the calculation of WCWC's available contractual water capacity. Sparta argues that Bowlin did not consider or apply regulations promulgated by the Illinois Environmental Protection Agency ("IEPA"), which set forth the prescribed method for evaluating the sufficiency of a community water supply in terms of water quantity. These regulations require a community water supply to be designed to produce at least 20% greater than the community's maximum average daily demand. 35 ILL. ADMIN. CODE. § 601.105. If a historical record of maximum average daily demand is not available, "maximum demand must be calculated as 1.5 times the average daily usage." *Id.*

Page 7 of 28

§ 604.115. But Bowlin only considered WCWC's current customers' *average* daily demand, not the *maximum* demand, and she did not consider whether WCWC could provide a 20% surplus over that maximum daily demand. Because her method of evaluating WCWC's current water capacity is inconsistent with the methodology prescribed by the IEPA, Sparta argues, her opinion is unreliable and, therefore, inadmissible.

In its second motion (Doc. 26), Sparta moves to strike and exclude previously undisclosed opinions made by Bowlin and contained in a declaration attached to WCWC's motion for summary judgment. In her declaration, Bowlin proffers an opinion about WCWC's three pumping stations' nominal pumping capacities and the supposed ability of WCWC to distribute water to parts of its system "without the water needing to pass through one of WCWC's pump stations," which, if true, could increase WCWC's overall water distribution capacity. (Doc. 20-2 at ¶ 8). She also attests that WCWC's contractual capacity can be expanded based on additional demand from its customer base, an opinion that Sparta asserts is based on inadmissible hearsay. (*Id.* at ¶ 9). Finally, Bowlin revised her analysis of Coulterville's maximum daily demand based on water usage data that WCWC could have obtained prior to the preparation of her expert report through a simple FOIA request. (*Id.* at ¶¶ 10-12). Sparta seeks to exclude this testimony or, alternatively, be permitted to file a supplemental rebuttal report.

In response, WCWC contends that Bowlin's calculations go to the weight and credibility of her testimony rather than its admissibility. It asserts that Sparta's arguments rest on the interpretation and applicability of the IEPA regulations and should be

reserved for cross-examination—not outright exclusion of the expert opinion. WCWC further argues that Bowlin has offered her expert testimony regarding WCWC's capacity based on her experience as a professional engineer and familiarity with WCWC's distribution system and hydraulic modeling, which is calibrated with WCWC's existing infrastructure. While Sparta disagrees with Bowlin's approach, WCWC argues, her "conclusions [are] the fruit of a rigorous, objectively-verifiable approach" not "mere speculation."

Furthermore, the information in Bowlin's declaration does not diverge from her original expert report and does not constitute any new opinions. At most, these attestations constitute supplemental opinions permitted under Federal Rule of Civil Procedure 26(e). WCWC explains that the data regarding its pumping capacity was previously provided to Sparta in discovery, and its pump ratings are neither disputed nor controversial. Indeed, Sparta's own expert agrees that WCWC's total pumping capacity of 1,992,960 gallons per day is "correct." (Doc. 26-6 at p. 3). Sparta's expert also agreed it was "possibly true" that WCWC could serve its customers without the water needing to pass through a pump station. And her declaration detailing the precise pump ratings is not a new opinion but rather a supplement to her initial report.

### A. *Legal Standard*

Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

147 (1999).

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014). The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 141 (1999)).

> Federal Rule of Evidence 702 provides that expert testimony is admissible if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Under this rule, an expert witness may testify about a scientific issue in contention if the testimony is based on sufficient data and is the product of a reliable methodology correctly applied to the facts of the case. *Lyons v. United States*, No. 120-CV-01120-JMS-DLP, 2021 WL 3076482, at *1 (S.D. Ind. July 21, 2021) (citing *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)).

The district court is the gatekeeper with respect to the screening of expert testimony in ensuring it is both relevant and sufficiently reliable. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). The "key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion; the inquiry must 'focus . . . solely on principles and

methodology, not on the conclusions they generate.'" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

**B.** *Discussion*

Sparta first moves to strike Bowlin's opinion because she incorrectly failed to consider WCWC's current customers' maximum daily demand and whether WCWC would be able to supply a 20% surplus over that maximum daily demand once Coulterville's demand was added into the equation. Then, when Bowlin corrected her opinions in her declaration to account for her mistakes, Sparta moved to strike those opinions as well. The Court declines to exclude or strike the majority of Bowlin's opinions.

To the extent Bowlin failed to account for IEPA regulations in her expert report, her alleged mistakes go to the weight of her testimony, not its admissibility. Bowlin's analysis and calculations were based on her knowledge as a water engineer, as well as her experience with WCWC's system. Thus, while she may have incorrectly used WCWC's average daily demand and failed to consider whether WCWC would have a 20% surplus, her methodology does not render her opinion unreliable.

With regard to Bowlin's affidavit submitted in support of WCWC's motion for summary judgment, a court generally will not consider new opinions set forth in an

expert affidavit that were not previously disclosed, unless the new opinions are harmless or the submitting party offers a substantial justification for the untimely disclosure. *Salomon v. Cincinnati Ins. Co.*, 954 F. Supp. 2d 828, 832–33 (N.D. Ind. 2013).

Here, Bowlin was required under Rule 26(e) to supplement her report with information she did not have at the time of her initial report. FED. R. CIV. P. 26(e). In her original report, Bowlin based her calculations on the assumption that Coulterville's average daily usage was 100,000 gallons per day, the same amount considered by Coulterville's engineer in HMG's analysis. When more accurate information on Coulterville's usage became available, Bowlin revised her calculations. Rule 26(e) permits her to do so.

With regard to Bowlin's statements regarding WCWC's pumping capacity, WCWC previously disclosed the pumping capacity of its pump stations in discovery; therefore, Sparta cannot claim to be surprised or ambushed by this information. Furthermore, the Court construes Bowlin's statement detailing the pump ratings as, at most, a supplement to her original report. And, because WCWC previously provided its pump ratings to Sparta during discovery, this information also is not new. As noted by WCWC, Sparta's own expert agreed with Bowlin's statement that WCWC's pumps are rated to deliver 1,992,960 gallons per day to the water distribution system.[1]

---

[1] While this statement is technically correct, Sparta's expert has opined that it is misleading in that the Prairie State Generation Company is guaranteed by contract a maximum of 300,000 gallons per day (approximately 283 gpm), which must be delivered by WCWC should it be required. (Doc. 26-6). Thus, the total available to WCWC for the pumping stations is actually lower. (*Id.*).

However, while Bowlin attested that WCWC's distribution system is not limited by this nominal pumping capacity because parts of WCWC's system can be served without the water needing to pass through a pumping station, Bowlin does not explain her methodology or state the data on which her opinion is based. (*Id.*). Without additional data to support Bowlin's statement, the Court finds the opinion unreliable. This opinion will be stricken.

The Court also will strike Bowlin's opinion in her declaration that "[i]t is my understanding that WCWC's contractual capacity can be expanded based on any additional demand from its customer base." Bowlin has not purported to be an expert on WCWC's contracts, nor does she have personal knowledge of WCWC's ability to amend those contracts. Instead, her opinion appears to be based entirely on inadmissible hearsay. Accordingly, this statement also will be excluded. Sparta's motions are otherwise denied.

## II.    Cross-Motions for Summary Judgment

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).

Once the moving party sets forth the basis for summary judgment, the burden then

shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Where, as here, cross-motions for summary judgment are pending, the court evaluates each motion under the Rule 56 standards cited above, "constru[ing] all inferences in favor of the party against whom [each] motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002).

### A. *Federal Protection Under 7 U.S.C. § 1926(b)*

Under 7 U.S.C. § 1926(b), municipalities may not curtail or limit water service provided or made available by any rural water association indebted to the USDA during the term of such indebtedness. Specifically, the statute states:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b).

Section 1926 was enacted as part of a federal statutory scheme to extend loans to certain associations providing water service or management, soil conservation practices,

or other essential community services to rural residents. *Tri-Twp. Water Dist. v. City of Trenton, Illinois*, 576 F. Supp. 3d 591, 594 (S.D. Ill. 2021) (citing *Jennings Water, Inc. v. City of North Vernon, Ind.*, 895 F.2d 311, 314-15 (7th Cir. 1989)). The statute is designed to both encourage rural water development and safeguard the interest of the United States in having its loans repaid. *Id.*

Congress intended for the statute to be read broadly to protect rural water associations indebted to the federal government from municipal encroachment. *Jennings*, 895 F.2d at 315. "[The] provision prevents local governments from expanding into a rural water association's area and stealing its customers . . . otherwise rural water service might be threatened by "the expansion of the boundaries of municipal and other public bodies into an area served by the rural system." *Le-Ax Water Dist. v. City of Athens, Ohio*, 346 F.3d 701, 705 (6th Cir. 2003). By protecting a rural water association's customer base, associations can spread their fixed costs over a large group of users. *Id.* "[T]he statute aims to prevent rural water costs from becoming prohibitively expensive to any particular user, to develop a system providing fresh and clean water to rural households, and to protect the federal government as insurer of the loan." *Id.*

In order to establish a violation of 7 U.S.C. § 1926, a plaintiff must show that: (1) it is a rural water association within the meaning of the statute; (2) it has a qualifying outstanding loan obligation; (3) it has provided or made service available to the disputed area; and (4) a competing entity curtailed or limited service in the area to which the plaintiff was providing service or making service available. *Tri-Twp. Water Dist.*, 576 F. Supp. 3d at 594 (citing *Brown County Water Utility, Inc. v. Town of Nashville, Ind.*, Case No.

Page 15 of 28

1:17-cv-02134-TWP-TAB, 2019 WL 2123461, at *7 (S.D. Ind. May 15, 2019)).

Here, there is no dispute that WCWC is a rural water association for purposes of Section 1926(b). The parties disagree, however, as to whether WCWC is indebted to the federal government and whether WCWC has provided or made service available to Coulterville.

### B.  *Qualifying Federal Indebtedness and Sparta's Motion for Sanctions*

Sparta argues WCWC is no longer indebted to the federal government with respect to the service area that potentially includes Coulterville; thus, it is no longer entitled to any protection that Section 1926(b) may once have provided. Sparta relies on evidence of WCWC's promissory note executed on March 8, 1979, and a security agreement, executed on April 1, 1980. Both documents had a 40-year term and, thus, matured prior to the date WCWC filed its Complaint. When those notes matured, Sparta argues, WCWC lost its Section 1926(b) protection.

In its response to Sparta's motion, WCWC attached its outstanding promissory notes executed with the USDA between 1995 and 2020. In a footnote, WCWC states that it "believed the issue of federal indebtedness to be settled since Sparta did not request information related to WCWC's indebtedness during discovery. Regardless, there can be no reasonable dispute that WCWC has been indebted to the USDA at all times relevant to the litigation and qualifies for Section 1926(b) protection based on this continuous indebtedness." (Doc. 29 at p. 3).

This disclosure by WCWC prompted Sparta to file a motion for discovery sanctions. (Doc. 27). Sparta argues that on February 4, 2021, WCWC served its initial

disclosures, which included evidence of two expired FmHA/USDA loans and a third loan that is unrelated to the disputed service area. Sparta asserts WCWC did not supplement its initial disclosures, as required under Rule 26(e), and discovery closed on September 8, 2021, without objection. It was not until October 22, 2021—less than a week before the parties' summary judgment opposition briefs were due—that WCWC produced seven FmHA/USDA Promissory Notes dated March 23, 1995, December 21, 2000, March 3, 2006 (two notes), September 7, 2007, June 21, 2012, and February 25, 2020.

Sparta argues this evidence should be excluded under Rule 37(c)(1) because WCWC had no justification for violating Rule 26(a)(1) or disregarding the Court's scheduling order. Sparta claims that WCWC has known from the outset that the existence of a qualifying federal loan is crucial to the merits of its case, and it should have collected its evidence of its indebtedness before filing its Complaint. Furthermore, WCWC should not be allowed to wait until after a summary judgment motion is filed to surprise Sparta with new evidence. Sparta claims it is prejudiced by the introduction of this new evidence because it moved for summary judgment based on the lack of federal indebtedness, and Sparta has not had the opportunity to examine any of WCWC's witnesses regarding the new loan documents.

In response, WCWC argues that it asserted federal indebtedness from the outset of this case, Sparta did not request information about WCWC's debts during discovery, and Sparta failed to question WCWC's representative about indebtedness during his deposition. Then, in its summary judgment briefing, Sparta alleged for the first time in this litigation that it disputed WCWC's existing federal indebtedness. WCWC explains

that while its initial disclosures provided WCWC's first USDA-related loan, it was unable to locate additional promissory notes with the USDA. It did, however, identify the USDA as having "information regarding WCWC's indebtedness to the federal government." In early October 2021, WCWC requested its existing promissory notes from the USDA to further corroborate its federal indebtedness. WCWC received the promissory notes from the USDA on October 12, 2021, and counsel promptly produced them to Sparta the following week.

Federal Rule of Civil Procedure 26(a)(1)(A)(ii) requires a party to produce all documents it intends to use to support its case "without awaiting a discovery request." *See also* FED. R. CIV. P. 26(e)(1)(A) (requiring parties to supplement incomplete disclosures). A party who fails to produce a document during discovery is prohibited from introducing it at trial "unless the failure was substantially justified or is harmless." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019). Courts must consider the following factors in determining whether to impose Rule 37 sanctions: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.* (quoting *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012)).

Here, Sparta can hardly claim to be surprised by the promissory notes. WCWC asserted its federal indebtedness throughout the litigation, and it identified the USDA as having information regarding its indebtedness in its initial disclosures. WCWC further provided its older promissory notes to Sparta, and it supplemented its disclosures once

Page 18 of 28

it received the current notes from the USDA. Second, any prejudice could be cured by a brief, additional deposition regarding the promissory notes. Third, there is no disruption to the trial, as the trial date was stayed pending the resolution of the instant motions for summary judgment. And fourth, Sparta has not presented any evidence of bad faith or intent in WCWC's failure to disclose the promissory notes earlier.

True, WCWC cannot avoid its obligation to prove its claims by shifting the burden to Sparta to ask for evidence in discovery that WCWC had a duty to automatically disclose. Nevertheless, the Court finds WCWC's actions to be harmless. WCWC has claimed to be indebted to the federal government from the outset, and it provided Sparta with the documentation in its possession. Sparta had the opportunity to question WCWC's corporate representative about its current indebtedness—or at least serve interrogatories or requests for admissions on the topic. Yet, it failed to do so, perhaps in a strategic effort to surprise WCWC at summary judgment. *See Uncommon*, 926 F.3d at 418 ("Rule 37, however, provides recourse for parties actually harmed by a litigant's noncompliance with disclosure obligations. It does not safeguard a party's decision to sense an error, seize on it, and then, when it is resolved, claim incurable harm in the face of apparent remedies. Litigation is adversarial, not a game of gotcha."). Finally, because a trial date was not set, Sparta could have sought leave to re-depose WCWC's witness on the limited issue of its current promissory notes.

For these reasons, the Court declines to exclude evidence of WCWC's current promissory notes, and thus Sparta's motion for discovery sanctions is denied. The Court further finds there is no genuine dispute that WCWC currently is indebted to the federal

government, satisfying the second requirement of 7 U.S.C. § 1926(b).

### C. *WCWC's Ability to Provide or Make Water Service Available to Coulterville*

WCWC and Sparta next dispute whether WCWC has provided or made service available to Coulterville. Section 1926 does not specifically define what it means for an association to have "provided" or "made service available." However, many courts have adopted a two-pronged test to determine whether a rural water district has "made service available."

Under the first prong, the water district must have the legal right under state law to serve the disputed area. *See Tri-Twp. Water Dist.*, 576 F. Supp. 3d at 595 (collecting cases). Under the second prong, the water district must demonstrate that it has the physical ability to serve the disputed area within a reasonable time after a request for service is made. *See Santa La Hill, Inc. v. Koch Dev. Corp.*, No. 307-CV-00100-RLY-WGH, 2008 WL 140808, at *5 (S.D. Ind. Jan. 11, 2008). Often referred to the "pipes-in-the-ground" test, the physical ability prong requires an association to show that "the lines in place are capable of delivering water in sufficient quantities to service the disputed area and that it has sufficient financial wherewithal to sustain the physical structures necessary to accommodate the customers' needs." *Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, No. 97-cv-185, 1998 WL 34168708, at *2 (E.D. Okla. Sept. 30, 1998).

### i.    Legal Right to Serve Coulterville

WCWC argues it has no defined service boundaries, but instead can provide water service wherever customers request it and WCWC can provide it. WCWC notes that it is authorized to operate its water distribution system by the IEPA, and its license is in good

standing. Further, WCWC has never been denied a construction permit by the IEPA and has never been placed on the IEPA's Restricted Status List or Critical Review List related to capacity issues. And, critically, Coulterville is a current customer of WCWC. Therefore, WCWC argues, it clearly has the legal authority to serve Coulterville under Illinois law.

Sparta argues WCWC does not have the legal right to service Coulterville because it lacks the requisite capacity under Illinois's water quantity regulations, as codified in Title 35 of the Illinois Administrative Code ("Code"). Under the Code, the IEPA must approve a community water supply's plans before the water association can expand its distribution system. Sparta contends that WCWC does not have sufficient capacity to provide water service to Coulterville with the volume of water that it needs or to obtain an IEPA permit to extend its water main to Coulterville due to its lack of capacity. Thus, under Illinois law, WCWC cannot provide or make service available to Coulterville.

As an initial matter, the Court addresses WCWC's contention that Coulterville is a *current* customer of WCWC, indicating it has both provided and made service available to Coulterville. On December 27, 2013, Steven Marlow, President of the Board of the Village of Coulterville, signed a User's Contract with WCWC for service at a meter north of Coulterville. (Doc. 21-1 at p. 7). The customer name on the contract is the Village of Coulterville. (*Id.*). As explained by Marlow, that contract relates solely to WCWC's provision of water to a customer located outside the Village's corporate limits. (Doc. 20-16 at ¶ 13). Around 2013, the IEPA expressed concern about the Village's source of surface water and lack of a secondary source of water. (*Id.*). For this one particular customer, the most efficient solution was to run a water line from a nearby WCWC service point to the

property. (*Id.*). Coulterville installed a meter and pays WCWC for the water that it then re-sells to the customer. (*Id.*). WCWC does not provide the water to Coulterville for distribution through its municipal water system, as there is no connection between the customer's property and Coulterville's distribution system. (*Id.*). So, while Coulterville does have a contract with WCWC, the Court does not find this evidence dispositive of whether WCWC has provided or made service available to Coulterville.

With regard to WCWC's remaining arguments, Sparta does not dispute that WCWC has no defined service boundaries and is authorized under Illinois law to provide water wherever customers request it and WCWC can provide it. Sparta argues, however, that WCWC cannot legally provide service to Coulterville. Sparta's expert water engineer, Harry D. Harman, P.E., opined that WCWC does not have sufficient capacity to provide water service to Coulterville or to obtain an IEPA permit to extend its water main to Coulterville because it has not maintained the reserve capacity required by Section 604.105. (Doc. 20-7 at pp. 33-34). Under the Code, a "community water supply must be designed to produce at least 20 percent greater than the maximum average daily demand." 35 ILL. ADMIN. CODE § 604.105(a). This 20% reserve capacity is intended to provide a safety net to help public water suppliers, like WCWC, deal with emergencies and other unexpected high demand without compromising the public safety or health of its customers. (*Id.* at p. 35). Because WCWC does not have a 20% reserve with regard to its current customers—and certainly not when including Coulterville's water demand— Sparta argues it has no legal right to serve Coulterville.

WCWC argues that Sparta has misapplied Section 604.105(a). The statute provides

that a community water supply must be "designed to produce" at least 20% greater than maximum average daily demand, but WCWC's system does not "produce" water. Thus, WCWC disputes that the statute applies to it in the first place. Moreover, there is no requirement that the total *current* excess capacity exceed the *future* anticipated usage. At most, WCWC asserts, Section 604.105 measures a system's "design"—not its current contractual capacity. According to WCWC, this is only logical; no community water supply would constantly purchase an additional 20 percent of finished water, only for it to go to waste. Instead, it must only by designed to accommodate the maximum demands under the regulations. Here, WCWC's system is not limited to its current contractual capacity and is "designed to produce" much more water than its customers need. WCWC claims its pumping capacity can deliver 1,992,960 gallons of water per day to its distribution system. Furthermore, WCWC asserts its contractual capacity can be easily and quickly increased should Coulterville request an additional connection. If WCWC needs to purchase additional water from its suppliers, it can do so under existing relationships or it can negotiate an amendment to its water purchase agreements. According to WCWC, its suppliers have assured it that additional water is available for purchase in the future should the need arise.

As an initial matter, the Court finds that Section 604.105(a) applies to WCWC. As argued by Sparta, if the regulation did not apply to WCWC simply because it does not have a water treatment facility, then any community water supply could skirt IEPA water quantity regulations by opting to purchase finished water from others instead of treating source water itself. Furthermore, WCWC's own expert agrees that Section 604.105(a)

applies to WCWC. (Doc. 20-9 at p. 23).

Applying the Code to the summary judgment evidence, the Court finds that WCWC lacks the capacity to provide or make available water service to Coulterville. Construing the evidence in favor of the non-movant (with regard to Sparta's motion), WCWC's distribution system has a pumping capacity of 1,992,960 gallons of water per day. (Doc. 21-2 at ¶ 7). A maximum of 300,000 gallons per day, however, must be set aside and delivered by WCWC to Prairie State Generation Company, should it be required. (Doc. 26-6 at p. 4). When correcting for the volume available from the connections with Kaskaskia, Nashville, and Rend Lake, WCWC has a pumping capacity of only 1,593,672 gallons per day. (Doc. 20-7 at p.p. 26-27).

Turning to WCWC's maximum average daily demand, when a community water supply does not maintain daily water usage records, "maximum demand must be calculated as 1.5 times the average daily usage." *Id.* § 604.115(c). WCWC has not maintained daily records of water purchased; thus, the maximum daily demand must be calculated by applying a factor of 1.5. (*Id.*).

In her declaration supplied in support of summary judgment, Bowlin looked at WCWC's water usage data from 2018, 2019, and 2020. (Doc. 21-2 at p. 3). As explained by Harman, however, the volume sold from year to year is influenced by weather conditions including wet or dry years. (Doc. 20-7 at p. 13). Both experts agree that the largest average volume sold over a three- to five-year period has the best potential for ensuring the public health and safety. (*Id.*; Doc. 20-9 at p. 7). While the largest average volume for the previous five years occurred in 2017, because Bowlin did not analyze that year, the Court

turns to the next highest demand, which occurred in 2018.

Applying a max factor of 1.5 pursuant to Section 604.115, WCWC's customers' maximum daily demand in 2018 was 1,473,729 gallons. Adding Coulterville's maximum daily demand of 134,568 increases the total maximum demand to 1,608,297 gallons per day. Thus, even accepting WCWC's argument that the Court should look at its system's pumping capacity (1,593,672 gallons per day) rather than its contractual capacity, WCWC does not have a sufficient water supply to serve Coulterville.

If the Court looks instead to WCWC's contractual capacity, WCWC can purchase 1,701,672 gallons per day under its current contracts.[2] (Doc. 20-7 at p. 23). Again, assuming a maximum daily demand of 1,608,297 gallons per day from WCWC's customers and Coulterville's customers combined leaves WCWC with 93,375 excess gallons per day—about a 5.5% reserve.

And that is before considering the water loss experienced by WCWC's distribution system due to minor leaks in the pipe joints. (Doc. 20-7 at p. 11). WCWC's average loss for a five-year period provided is 5.6%, meaning that an average of 5.6% of the water that WCWC can purchase under its existing water supply agreements is not actually available for sale to WCWC's customers.[3] (*Id.*). If 5.6% is subtracted from WCWC's available water,

---

[2] Bowlin attested in her declaration that WCWC has 1,715,333 total gallons per day of contractual capacity without considering the capacity from Kinkaid-Reed's Creek. As noted by Sparta in its motion to exclude, this number is not accurate. Bowlin calculated WCWC's contractual capacity by dividing the 25 million gallons WCWC purchases from Kaskaskia by 30 days to determine that WCWC can purchase 833,333 gallons per day from that supplier. Of course, not every month has 30 days. More accurately, WCWC can purchase 821,917 gallons per day under its agreement with Kaskaskia (819,672 gallons per day in a leap year). (Doc. 20-7 at p. 10). Thus, WCWC can purchase 13,661 gallons per day *less* than Bowlin calculated—or 1,701,672 gallons.

[3] Sparta's expert Harman noted that while 5.6% is the average lost water over the five-year's worth of provided data, lost water was as high as 40% in July 2018. (Doc. 20-7 at p. 29).

that leaves only 1,606,378 gallons per day for distribution to its customers. Using 2018's maximum daily demand of 1,608,297, WCWC has already overcommitted the amount of water it can purchase and deliver—without any reserve. (*See* Doc. 20-7 at p. 34). According to Harman, if WCWC submitted a project for a construction permit, the IEPA would deny it until additional sources of water have been secured. (*Id.* at p. 6). Based upon this data, the IEPA would not allow WCWC's water main to be extended to Coulterville. (*Id.*).

WCWC asserts capacity is not a problem because it can simply buy more water from its suppliers in response to increased customer demand or IEPA interpretation. WCWC's CEO/Manager Steven Fletcher attested that, based on his "previous communications with representatives of the Kaskaskia Water District, the City of Nashville, and Rend Lake, WCWC can purchase additional water should a need arise in the future." (Doc. 21-1 at ¶ 18).

Sparta argues this statement is inadmissible hearsay, which cannot be used to support or defeat a summary judgment motion. The Court agrees. This statement, based on conversations held outside of court with unidentified representatives at unknown times, is being used by WCWC to prove it can expand its capacity if necessary. Therefore, the statement constitutes hearsay. Even if the statement were admissible, at most it represents previous communications that Fletcher had with unknown people at unknown times. Whether Kaskaskia, Nashville, and/or Rend Lake are currently agreeable to amending their contracts with WCWC and physically capable of selling sufficient additional water to WCWC is unknown. WCWC's failure to secure evidence of

its ability to expand its water supply capabilities is fatal to its claim. *See Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.").

Sparta has presented evidence that WCWC cannot provide water service to Coulterville without violating Section 604.105 of the IEPA regulations. Thus, WCWC cannot establish the "legal right" prong of Section 1926(b).[4] WCWC has failed to rebut that evidence with competent summary judgment evidence of its own. Accordingly, WCWC's motion for summary judgment is denied as to its claim in Count 1 for declaratory judgment under 7 U.S.C. § 1926(b), and Sparta's motion for summary judgment is granted. And because Sparta is granted summary judgment on Count 1, WCWC's claims under 42 U.S.C. § 1983 (Count 2), for a preliminary and permanent injunction against Sparta (Count 3), and for a constructive trust (Count 4) also fail.

CONCLUSION

For these reasons, the Court **DENIES** the Motion to Exclude Certain Opinion Testimony (Doc. 18), **DENIES in part and GRANTS in part** the Motion to Strike and Exclude Certain Untimely and Unreliable Opinion Testimony (Doc. 26), and **DENIES** the Motion for Discovery Sanctions (Doc. 27) filed by Defendant City of Sparta.

The Court **GRANTS** the Motion for Summary Judgment filed by Defendant City

---

[4] Because WCWC has not established it has a legal right to serve Coulterville, the Court need not address the "pipes in the ground" prong of the Section 1926(b) analysis.

Page 27 of 28

of Sparta (Doc. 19), and **DENIES** the Motion for Summary Judgment filed by Plaintiff Washington County Water Company, Inc. (Doc. 21).

The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant City of Sparta and close this case.

**IT IS SO ORDERED.**

DATED:    September 28, 2022

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**